[No. 43473-0-I. Division One. July 10, 2000.]

DIANE E. SEDLACEK, *Individually and as Administrator, Appellant*, v. LARRY O. HILLIS, ET AL., *Respondents*.

2

*John S. Stocks* (of *Van Siclen, Stocks & Firkins*); and *Terry Ann Zundel*, for appellant.

*William R. Hickman* and *Danielle A. Hess* (of *Reed McClure*), for respondents.

KENNEDY, J. — Diane E. Sedlacek, individually and as the administratrix of the estate of her deceased husband Andrew J. Sedlacek, brought this action against Larry O. Hillis, his wife Veralene Hillis, and Skyline Park Limited Partnership, alleging, inter alia, that the Sedlaceks were wrongfully discharged from their employment as apartment managers based on disability discrimination contrary to RCW 49.60.030, and that they were wrongfully discharged from their employment based on disability discrimination in violation of a clear mandate of public policy. The trial court dismissed these and the Sedlaceks' related tort claims for negligent and intentional infliction of emotional distress (outrage), by way of summary judgment. We affirm the dismissal of the statutory claims because Skyline Park Limited Partnership had fewer than eight employees when the terminations occurred. In the unpublished portion of this opinion, we also affirm the dismissal of the tort claims for negligent and intentional infliction of emotional distress (outrage). But we reverse the dismissal of the Sedlaceks' common-law wrongful discharge claims based on our Supreme Court's reasoning in *Roberts v. Dudley*, 140 Wn.2d 58, 993 P.2d 901 (2000), and because genuine issues of material fact preclude summary judgment as a matter of law.

## FACTS

In August 1988, Larry O. Hillis and his wife Veralene Hillis, the general partners of Skyline Park Limited Partnership, hired Diane E. Sedlacek and her husband Andrew J. (Jack) Sedlacek to manage the Skyline Park Apartments, a 192-unit apartment complex located in Kent, Washington, and owned by the limited partnership. It is undisputed that the Sedlaceks were hired as a team. Each of them was paid

a monthly salary of $1,600 by the time of the discharge and, as part of their compensations, the Sedlaceks were also provided with a rent-free apartment at the complex in which to reside, and with health insurance coverage paid for by the limited partnership.

Beginning in 1994, the vacancy rate at the apartment complex averaged 15 a month, which was a matter of ongoing discussion and concern. Nevertheless, the Sedlaceks received regular raises in their salaries and annual Christmas bonuses throughout their tenure as employees, and they were never reprimanded or told that their performance was in any way unsatisfactory, until Jack became ill.

On December 22, 1995, Jack was diagnosed with acute myelogenous leukemia and immediately hospitalized, until January 31, 1996. During this time, Diane spent considerable time at the hospital, at her husband's side. She promptly notified the Hillises of her husband's illness. During Jack's hospitalization and following his release for outpatient treatment, the Sedlaceks' two adult sons and their daughter-in-law assisted the Sedlaceks with their management responsibilities, working as volunteers without pay. The Hillises were aware that this was the case, and voiced no objection. Diane later testified that Jack was able to perform his management duties following his release from the hospital, only slower and with the help of the family, and that she herself continued with her regular duties following Jack's release from the hospital. She also claims that following Jack's diagnosis, the Hillises assured her that, no matter what happened, she would always have a job at the apartment complex. But she also testified that she noticed an abrupt change in the Hillises' attitude, after they learned of Jack's illness. Whereas the two couples had previously been friends, the Hillises now shunned the Sedlaceks, acting, according to Diane, as if they thought Jack's cancer was transmittable.

By February 1, 1996, the number of vacancies at the apartment complex had reached an all-time high of 37. On

or about February 12 of that year, the Hillises hired Kimberly Greene and her company, Wise Property Management & Leasing Consulting Services, for a period of 30 days, to conduct an investigation of the vacancy problem and to provide possible solutions. The Sedlaceks were informed that Greene would supervise their work over the 30-day period, and that they were to follow her directions. Upon inquiry by Diane, the Hillises assured her that they had no intention of replacing the Sedlaceks as managers.

In early March, the Hillises contacted three additional property management companies for additional evaluations. Greene and two of these three additional consultants recommended that the Sedlaceks be replaced, due to deficiencies in maintenance and marketing of the apartments. Tecton Corporation described the Sedlaceks as "overwhelmed by the tasks at hand and unable to provide detailed management of the community[,]" and noted that Greene had explained that "the current management couple has been with the property for a number of years and that the recent health difficulties of one employee [had] resulted in a significant downturn in maintenance standards and property appearances." Clerk's Papers at 39. This company also recommended that the Hillises make a change in management, right away:

> We appreciate the generosity that you have already extended to these employees, allowing them to draw full salaries while performing about half of their regular duties. Since you have already been extremely sensitive to the needs of these long-term employees, we strongly recommend that once hired, our firm be allowed to move quickly in order to replace this couple with more capable veteran Tecton employees. Procrastinating this decision will only jeopardize the gains made by Ms. Greene this past month, and allow the property to potentially slip back into a position of high vacancy.

*Id.* at 39-40.

Precision Management Company wrote in a report to the Hillises that there was a great deal of trash and debris throughout the parking lots and property, that tenants

were inappropriately allowed to repair their cars in the parking lots, resulting in oil spills, that the first thing people noticed when they drove into the complex was weeds, and that

> [w]hen we shopped the manager, she specifically made a point to keep us away from families because it was quieter. This alone could bring a suit against the manager and the owner, resulting in hundreds of thousands of dollars being awarded to the person being discriminated against. HUD is actively looking for these situations and sends out shoppers frequently to catch people.

*Id.* at 61. This company, too, recommended that the Sedlaceks be replaced. J. B. McLoughlin & Company also shopped the complex, noting: "This property looks in need of attention to detail, *i.e.*, paint the curbs, landscape improvements, buildings need moss removal and signage." *Id.* at 70.

In a declaration in support of the Hillises' motion for summary judgment, Greene said that when she first arrived at the apartment complex, she observed discarded hot water tanks, tires, toilets, and other garbage on the grounds of the complex, that the rental office smelled of urine and cigarette smoke, and that a dog, a bird, and a young child were in the rental office. She also said that Diane was not dressed as professionally as she should have been. Although she reported that the vacant apartments were spacious, clean, attractive, and ready to be rented, Greene noted that the outside was not being maintained properly—so that people coming to view vacant apartments could easily be discouraged from seeking out the rental office, by the shabby appearance of the grounds and buildings.

Greene commenced an aggressive marketing campaign, and persuaded the Hillises that they needed a screening company to review rental applications, and professional landscapers to weed and refurbish the shrubbery areas. She also undertook to train the Sedlaceks with respect to marketing, maintenance, and federal fair housing regulations. Greene reported that she found the Sedlaceks resis-

tant to her efforts: They refused to make the rental office a no-smoking, no-pet, child-free area; they did not pick up the grounds every day, in spite of her recommendations that this be done; they continued to steer racial minorities and families with children away from certain buildings within the complex. Greene maintained that although she was aware of Jack's illness, she would have recommended that the Sedlaceks be replaced, even if he had not been ill, based on these shortcomings.

The vacancy rate improved dramatically in the ensuing days and weeks. By March 4, 17 of the 37 vacant apartments had been rented. By March 13, an additional three apartments had been rented. Greene congratulated the Sedlaceks, in writing, with respect to their hard work, telling them that they were doing good work on the rentals and that they both were "obviously dedicated to the community and to your current residents." Clerk's Papers at 246.

Although Greene and the Hillises maintain that the improvements with respect to the vacancy rate were due solely to Greene's efforts, Diane maintains to the contrary. First, she opined that the vacancy problem was cyclical, due to market conditions beyond her control, and that the improvements in the vacancy rate during the weeks Greene was in charge were due to Diane's own hard work and willingness to follow Greene's suggestions. Diane and her witnesses said that the Hillises had never wanted to spend much money for maintenance and repairs of the complex; that the only money available for removal of such things as broken hot water tanks and appliances was from petty cash, so that it was impossible to haul such items for disposal until sufficient funds were on hand to pay the necessary costs; and that the recurring problem with trash on the property was because the Hillises refused to invest in the larger-sized garbage containers that were needed to contain the trash from a 192-unit apartment complex. To illustrate this point, Diane produced photographs taken during the month following the Sedlaceks' discharge, show-

ing the same kind of litter in the common areas that allegedly had been a factor in their discharge from employment. She claimed that while the Sedlaceks managed the complex, the grounds were policed for litter often—more than once a day when necessary. She and others claimed that flowers were always planted and the planting beds maintained during the growing season, that Diane dressed appropriately for her duties, which included yard maintenance as well as running the rental office, and that the rental office was kept spotless, as well as fresh-smelling by the use of potpourri. She denied that she kept a bird in the rental office, and said that the bird lived in its cage in her granddaughter's bedroom—she brought it to the office to show Greene only because Greene heard the bird chirping and asked to see it. Diane also presented evidence that she and her husband kept their own apartment spotless, and that they took pride in showing it to prospective tenants who wanted to see how similar, vacant apartments might look when furnished. A carpet cleaner signed a declaration that he was called in regularly to clean the carpets in the office and that, while there was a dog, regular cleanings took care of any pet-related damage to the carpet.

Diane also denied any racial discrimination or discrimination against families with children during the time she and her husband managed the apartment complex, explaining that families with children, many of whom were racially mixed, simply preferred to live close to the children's play area and close to other families with children, so that there would be playmates close at hand.

On March 14, 1996, acting through Greene, the Hillises discharged both Sedlaceks from their employment, giving them only three days to vacate their apartment. Shortly thereafter, the Hillises also evicted one of the Sedlaceks' adult sons and his wife from their apartment within the complex, without explanation. Greene was initially hired to manage the apartment complex in place of the Sedlaceks; later, another manager and an assistant manager of Greene's choosing were brought in to manage the complex.

Jack died from leukemia in August 1996. In the interim, the Sedlaceks lost their health insurance coverage, lost their automobile, lost many of their personal belongings, and became dependent upon welfare for their subsistence. On behalf of herself and the estate of Jack, Diane brought this action against the Hillises and Skyline Park Limited Partnership, alleging, inter alia, disability discrimination in violation of chapter 49.60 RCW (including a claim brought by Diane individually for discrimination based on association with a disabled person) and wrongful termination of both Sedlaceks based on disability discrimination, in violation of public policy.

The trial court dismissed Diane's complaint on summary judgment, in its entirety, and she appeals.

## DISCUSSION

### Standard of Review

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "The motion will be granted, after considering the evidence in the light most favorable to the nonmoving party, only if reasonable persons could reach but one conclusion." *Reynolds v. Hicks*, 134 Wn.2d 491, 495, 951 P.2d 761 (1998). "When reviewing a summary judgment order, an appellate court engages in the same inquiry as the trial court." *Id.*

■ The party moving for summary judgment has the initial burden of showing there is no dispute as to any issue of material fact. *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 66, 837 P.2d 618 (1992). Once that burden is met, however, the burden shifts to the nonmoving party to establish specific and material facts to support each element of his or her prima facie case. *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). "In order

for a plaintiff alleging discrimination in the workplace to overcome a motion for summary judgment, the worker must do more than express an opinion or make conclusory statements." *Id.* (citing *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988)).

## I. Washington's Law Against Discrimination

"The general rule in Washington is that an employment relationship is terminable at will by either the employer or the employee." *Selix v. Boeing Co.*, 82 Wn. App. 736, 740, 919 P.2d 620 (1996). Consequently, the "rule governing termination of at-will employees is generally that 'employers [can] discharge employees for no cause, good cause or even cause morally wrong *without fear of liability.'*" *Bakotich v. Swanson*, 91 Wn. App. 311, 314, 957 P.2d 275 (1998) (alteration in original) (quoting *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 225-26, 685 P.2d 1081 (1984)). "The employer's absolute prerogative to discharge employees has not remained unconstrained, however." *Thompson*, 102 Wn.2d at 226.

One constraint on employers is Washington's Law Against Discrimination, which prohibits discharge based on an employee's "age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a disabled person." RCW 49.60.180(2). Under this law, a person with "any sensory, mental, or physical disability" has "[t]he right to obtain and hold employment without discrimination[.]" RCW 49.60.030(1)(a). Nonetheless, Washington's Law Against Discrimination provides a remedy only as to employers that employ eight or more persons for any part of the day on which the unfair practice is alleged to have occurred. RCW 49.60.180(2); WAC 162-16-160(4); *see also Griffin v. Eller*, 130 Wn.2d 58, 64, 922 P.2d 788 (1996).

In the present case, the trial court concluded that Diane Sedlacek "raised no genuine issues of material fact regard-

ing his chapter 49.60 RCW claim against defendants *particularly as to 'eight employees*[.]' " Clerk's Papers at 1051 (italics handwritten in original). Diane contends that the trial court erred by doing so because Skyline Park Limited Partnership had "employment relationships" with more than six additional persons, besides the Sedlaceks, including persons who worked at Skyline Park Apartments but received no pay directly from the limited partnership.[1]

■ A "person's employment relationship with the employer determines whether that person is employed for purposes of the Law Against Discrimination's eight-employee threshold." *Anaya v. Graham*, 89 Wn. App. 588, 593, 950 P.2d 16 (1998). This court has adopted the "the payroll method as an effective means of demonstrating whether a person has an employment relationship on the day an alleged unfair employment practice is alleged to have occurred" because this method is easy to understand and apply, and because doing so is consistent with federal antidiscrimination law. *Id.*; *see* WAC 162-16-160(3)(c) (explaining the intent of regulations is to be consistent with federal law); *see also Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 117 S. Ct. 660, 664, 136 L. Ed. 2d 644 (1997) (adopting the payroll method to decide under what circumstances an employer "has" an employee for the purposes of Title VII of the Civil Rights Act of 1964). Under the payroll method, the "individual's name on the employer's payroll for the period covering the pertinent dates will ordinarily demonstrate an employment relationship, whether or not the person actually performed work on that day." *Anaya*, 89

---

[1] Diane also argues that Skyline Park Limited Partnership had "employment relationships" with persons employed at other properties owned by Veralene and Larry Hillis individually. But we find no support for her contention that employees of Veralene and Larry Hillis individually are properly counted as employees of the limited partnership. *See* WAC 162-16-160(8) ("Corporations and other artificial persons that are in common ownership or are in a parent-subsidiary relationship will be treated as separate employers unless the entities are managed in common in the area of employment policy and personnel management."). The record contains no support for the proposition that the various entities owned by the Hillises are managed in common in the area of employment policy. Therefore, we conclude, on this record, that Skyline Park Limited Partnership did not have employment relationships with employees of the Hillises' individually-owned properties.

Wn. App. at 593. Nonetheless, as Diane correctly argues, the payroll method is not necessarily dispositive, because under WAC 162-16-170(4), a worker is presumed to have an employment relationship when any two of the following are present:

> (a) The purchaser of work in fact controls the manner and means of performance of the work.
>
> (b) The worker is paid on the basis of time worked (hourly, monthly, etc.).
>
> (c) The worker is treated as an employee for tax purposes.

But if at least two of the above indicators are *not* present, the worker is an independent contractor who is not counted as an employee for the purposes of chapter 49.60 RCW. WAC 162-16-160(11).

In this case, Skyline Park Limited Partnership's January 15, 1996 to March 15, 1996 tax payroll journals list only two names: Diane and Jack Sedlacek. Several other persons worked for the limited partnership from time to time, including Veralene Hillis who was sometimes on the payroll, gardeners who were employed by an independent contractor, a woman who cleaned vacant apartments, a man who did painting at the complex, and, of course, Greene. Greene was clearly an independent contractor. Under WAC 162-16-160(11) independent contractors will not be counted as employees. With the possible exception of Veralene Hillis (whose duties as an employee are not made clear in the record) all these people were paid by task, rather than based on time worked. In addition, we find no evidence in the record that the gardeners, who worked for an independent contractor, were properly treated as employees under the standards set out in WAC 162-16-170(4).

██ Whatever her duties may have been, Veralene Hillis would not be counted toward the eight-employee threshold because she was a general partner of Skyline Park Limited Partnership, and under WAC 162-16-160(18) partners will not be counted as employed by the partnership or each other.

Under WAC 162-16-160(13) volunteers who work without pay will be counted if the volunteers are generally treated in the manner that employers treat employees. We need not consider whether the volunteers who assisted the Sedlaceks after Jack's diagnosis could qualify as employees, in that even if they could, there were too few of them to bring the employer up to the eight-employee threshold.

In sum, Washington's Law Against Discrimination, chapter 49.60 RCW—which applies only to businesses that employ eight or more persons—does not apply to Skyline Park Limited Partnership, the employer of only two persons at the time of the Sedlaceks' discharge.

This being so, we need not discuss Diane's individual claim for discrimination "based on her marital status and association with a disabled person in violation of RCW 49.60.030 and WAC 162-16-150." Clerk's Papers at 567. Because Skyline Park Limited Partnership had fewer than eight employees, this is not an appropriate case in which to consider whether RCW 49.60.030 should be so liberally construed as to create an association discrimination cause of action by adopting the federal Americans with Disabilities Act's prohibition on discrimination "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association[.]" 42 U.S.C. § 12112(b)(4) (1994). This is not to say that Diane has no individual cause of action but merely that her cause of action does not arise under chapter 49.60 RCW, in that Skyline Park Limited Partnership had fewer than eight employees at the relevant time.

We affirm the trial court's dismissal of Diane's claims on behalf of herself and her deceased husband's estate for employment discrimination under chapter 49.60 RCW.

II. Wrongful Discharge in Violation of Public Policy

Diane contends that the trial court erred by dismissing the Sedlaceks' wrongful discharge in violation of public policy claims against Skyline Park Limited Partnership.

██ ██ The tort of wrongful discharge is a narrow exception to the employment-at-will doctrine. *White v. State*, 131 Wn.2d 1, 18, 929 P.2d 396 (1997). Under this theory, "an employee will have 'a cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy.'" *Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989) (quoting *Thompson*, 102 Wn.2d at 232). There are four elements of a public policy tort case:

> (1) The plaintiffs must prove the existence of a clear public policy (the *clarity* element). (2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the *jeopardy* element). (3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the *causation* element). (4) The defendant must not be able to offer an overriding justification for the dismissal (the *absence of justification* element).

*Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996) (citations omitted).

A. The Clarity Element

 Although "[t]he question of what constitutes a clear mandate of public policy is one of law," *Dicomes*, 113 Wn.2d at 617, the employee bears the burden of establishing the existence of a clear mandate of public policy. *Gardner*, 128 Wn.2d at 941.

> These public policy tort actions have generally been allowed in four different situations: (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.

*Id.* at 936.

> "In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory,

or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, *courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.*"

*Thompson,* 102 Wn.2d at 232 (citation omitted). "Courts must 'find' not 'create' public policy, and the existence of such public policy must be 'clear.'" *Selix,* 82 Wn. App. at 741.

In *Roberts v. Dudley,* 140 Wn.2d 58, 993 P.2d 901 (2000), our Supreme Court recognized a cause of action for the common-law tort of wrongful discharge in violation of public policy against an employer with fewer than eight employees who allegedly had discharged the plaintiff because she was pregnant. Our Supreme Court examined statutory declarations of public policy with regard to sex discrimination, including Washington's Law Against Discrimination, and a judicial affirmation of this policy in a case of sex discrimination, and concluded that there is, in Washington, a clear mandate of public policy against sex discrimination. Therefore, although a plaintiff whose employer is exempt from liability under chapter 49.60 RCW may not avail herself of statutory remedies for such things as discriminatory refusal to hire, workplace discrimination, and discriminatory employment advertising on the basis of sex, and may not recover attorney fees under chapter 49.60 RCW, the clear mandate of public policy against sex discrimination will support the long-established tort of wrongful discharge in violation of public policy, where an employee is discharged based on sex discrimination. *Id.* at 76.

We must determine whether there is a clear a mandate of public policy against discriminatory discharge based on disability, as there is against discriminatory discharge based on sex. We conclude that the mandate of public policy is equally clear, whether the issue is sex discrimination or disability discrimination. In the "purpose of this chapter" section of Washington's Law Against Discrimination, our Legislature expressly found that the "practices of discrimi-

nation against any of [Washington's] inhabitants because of . . . the presence of any sensory, mental, or physical disability . . . threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." RCW 49.60.010. Although this law creates a statutory cause of action only against employers that employ eight or more persons, RCW 49.60.180(2), a stated purpose of this law is to eliminate and prevent discrimination in employment. RCW 49.60.010. Specifically, our Legislature declared that a person with "any sensory, mental, or physical disability" has "[t]he right to obtain and hold employment without discrimination[.]" RCW 49.60.030(1)(a). In addition, our Supreme Court has declared that Washington's Law Against Discrimination "embodies a public policy of the 'highest priority.' " *Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 521, 844 P.2d 389 (1993) (quoting *Allison v. Hous. Auth.*, 118 Wn.2d 79, 86, 821 P.2d 34 (1991)); *see also Martini v. Boeing Co.*, 137 Wn.2d 357, 364-65, 971 P.2d 45 (1999). *Xieng* was a case involving alleged discrimination based on national origin; *Allison* was a case involving alleged retaliation for bringing a complaint for age discrimination; and *Martini* was a case of disability discrimination. We find no basis for distinguishing between the *types* of discrimination prohibited by chapter 49.60 RCW, either on the face of the statute or in our Supreme Court's recognition of the clear mandate of public policy against discrimination in employment found in that statute.

Following the clear mandates of public policy set forth by our Legislature and our Supreme Court, we conclude that, like sex discrimination, disability discrimination in employment contravenes a clear mandate of public policy, notwithstanding chapter 49.60 RCW's eight-employee threshold. Accordingly, we hold that Washington common law recognizes a cause of action for unlawful discharge in violation of public policy based on disability discrimination just as it

does for unlawful discharge in violation of public policy based on sex discrimination.[2]

■ Because it is undisputed that Jack and Diane were hired as a team and discharged as a team, we deem it irrelevant to the issues on appeal that Diane was not herself disabled. It can be no less a violation of public policy to wrongfully discharge a team based on the disability of one member of the team than it would be to wrongfully discharge a single employee based on his or her disability.

Here, if Jack was wrongfully discharged in violation of public policy, then so was Diane; if his discharge was permissible under public policy, then so was hers.

B. The Jeopardy Element

■ The next issue is whether the Sedlaceks' discharge contravenes or jeopardizes the public policy of eliminating and preventing disability discrimination in employment. See Gardner, 128 Wn.2d at 941.

"To establish jeopardy, plaintiffs must show they engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy." Id. at 945. "Additionally, the plaintiff must show how the threat of dismissal will discourage others from engaging in the desirable conduct." Id. Because this case involves Jack's status as disabled, rather than any protected conduct in which he engaged, we must determine whether there is a dispute as to any material fact regarding whether Jack was disabled.

■ Skyline Park Limited Partnership admits that in

---

[2] In terms of statements of public policy, there is little to distinguish the two types of claims except this state's Equal Rights Amendment, WASH. CONST. art. XXXI (amendment 61). But our Supreme Court did not rely upon our Equal Rights Amendment in reaching the conclusion in the majority opinion in Roberts, 140 Wn.2d 58. Although three Justices who signed the majority opinion found additional support for the decision, based on that amendment, see Id. at 76-77 (Alexander, J., concurring) and a fourth Justice agreed that the Equal Rights Amendment is a powerful source of public policy forbidding gender discrimination and could support a common-law action for wrongful discharge for sex discrimination, Id. at 78-79 (Talmadge, J., concurring in the result), it is clear that the majority would have ruled as it did even without the amendment. Thus, the lack of a similar constitutional amendment declaring equal rights for disabled individuals cannot change the result.

December 1995 its general partners became aware that Jack had leukemia. Nonetheless, the limited partnership denies that he was disabled within the meaning of that term in employment discrimination cases. The limited partnership points to *Doe v. Boeing Co.*, 121 Wn.2d 8, 846 P.2d 531 (1993), wherein our Supreme Court, noting that chapter 49.60 RCW does not define "sensory, mental, or physical handicap" and that the Legislature delegated the authority to the Human Rights Commission to promulgate rules and regulations to carry out the purposes of the act, said that WAC 162-22-040 defines "handicap" for the purposes of determining whether an unfair practice has occurred. *Id.* at 14-15 (citing *Phillips v. City of Seattle*, 111 Wn.2d 903, 906-08, 766 P.2d 1099 (1989)). And that definition is circular: It requires both the presence of a medically cognizable or diagnosable condition that is abnormal and a showing of discrimination because of that condition. Thus, a claimant may have a medically cognizable or diagnosable condition, such as Jack's leukemia, but is not "handicapped" for purposes of enforcing an unfair practices claim unless there is evidence that the employer discriminated against the employee plaintiff because of that condition. *Id.* at 15-16. Here, there is no question that Jack had leukemia and that it is a medically cognizable or diagnosable condition. But the limited partnership claims there was no "handicap" because Diane cannot show that the limited partnership discriminated against the Sedlaceks because of that condition. We disagree.

▬ Whether there was a "handicap" within the meaning of this circular definition is a question of fact. *Id.* at 16. Here, there is evidence which, if believed by the trier of fact, would support a finding that Jack was "handicapped."

▬▬ Proof of discrimination requires a showing that the employer took action because of the employee's condition or that the employer failed to take such steps as would be reasonably necessary to accommodate the employee's condition. *Id.* at 17. Although the limited partnership presented evidence that the Sedlaceks were discharged

only because they were not doing their job in a satisfactory manner, resulting in a high vacancy rate at the apartment complex, Diane presented controverting evidence that, if believed by a trier of fact, would establish that the recurring problem with garbage strewn about the premises was the result of the Hillises' reluctance to spend the money for larger garbage containers and their failure to provide funds necessary to have discarded appliances hauled to the dump in a timely manner; that the shabby exterior was the result of the Hillises' reluctance to put money into necessary repairs and maintenance; and that these problems continued after the Sedlaceks were discharged, as evidenced by photographs taken after that date. Moreover, a rational trier of fact could conclude that the change in attitude described by Diane—to the effect that the Hillises, who once were friends, shunned the Sedlaceks after they learned about Jack's leukemia, and acted as if they were afraid the disease was transmittable—was both real and indicative of the true reason for the discharge. Finally, although a rational trier of fact could easily conclude (1) that the premises were *not* kept up in accord with commercially reasonable standards while Jack was in the hospital for over a month with Diane at his side, and (2) that this contributed to the vacancy rate at the apartment complex, we find little evidence in the record that the Hillises as general partners took reasonable steps to accommodate their allegedly "handicapped" employee.[3] Failure to reasonably accommodate constitutes discrimination under chap-

---

[3] In an answer to one of the Sedlacek's interrogatories for the proceedings below, the Hillises said that they accommodated the Sedlaceks by acquiescing in allowing them to turn most of their duties over to volunteers while Jack was in the hospital and thereafter, by not docking the Sedlaceks' pay while Jack was in the hospital and receiving medical treatment following his release from the hospital, and by allowing the Sedlaceks to remain in their apartment rent free. The Hillises also claimed that any additional accommodation would have been unduly burdensome, and in any event the Sedlaceks did not ask for further accommodation. Clerk's Papers at 182-83. *But see Goodman v. Boeing Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995) (although employee bears burden of giving the employer notice of a disability, such notice triggers the employer's duty to take positive steps to accommodate the disability); *Dean v. Municipality of Metro. Seattle*, 104 Wn.2d 627, 639, 708 P.2d 393 (1985) (leaving initiative to seek accommodation up to employee insufficient, once employer learns of employee's illness).

ter 49.60 RCW; thus, failure to reasonably accommodate will support a finding that the employer discriminated because of the condition, thereby satisfying that element of "handicap." *Id*. at 17.

The limited partnership does not argue that failure to reasonably accommodate is irrelevant to a common-law claim of wrongful discharge in violation of public policy. Moreover, it would seem anomalous if an employer with fewer than eight employees could simply discharge a disabled employee, rather than taking reasonable steps to accommodate the disability, and thereby escape liability for wrongful discharge in violation of public policy. We are not persuaded that the limited partnership is entitled to summary judgment as a matter of law on the question of whether Jack was "handicapped" within the peculiar meaning of that term in disability discrimination law. Considering the evidence in the light most favorable to Diane, we conclude that there is a genuine dispute as to this material fact. The limited partnership failed to meet its initial burden of showing that there is no genuine issue of fact as to this issue. *See Hiatt*, 120 Wn.2d at 66. Indeed, if Jack was disabled, and the Sedlaceks were discharged on that basis in lieu of reasonable accommodation by the employer, then Jack's status directly relates to the public policy of eliminating and preventing disability discrimination in employment.

## C. The Causation Element

The next element of a public policy tort claim is whether disability discrimination in employment caused the Sedlaceks' discharge. *See Gardner*, 128 Wn.2d at 941. If Skyline Park Limited Partnership discharged the Sedlaceks because Jack's illness adversely affected his job performance, without making such reasonable accommodations as would enable Jack to perform satisfactorily, then public policy was violated. *See Doe v. Boeing Co.*, 121 Wn.2d at 18 (scope of employer's duty to accommodate an employee's condition is limited to those steps reasonably necessary to enable the employee to perform his or her job). The record

contains disputed facts as to why the limited partnership discharged Jack and Diane and little evidence that the employer took positive steps to accommodate Jack's abnormal condition. The limited partnership claims it discharged the Sedlaceks only because vacancy rates were up and the apartment complex was ill-maintained. Nonetheless, Greene—who was hired by the limited partnership—opined that Jack's leukemia caused the significant downturn in maintenance standards and property appearance at Skyline Park Apartments. Moreover, Tecton Corporation, another management consultant hired by the limited partnership, opined that the limited partnership should replace the Sedlaceks sooner, rather than later, notwithstanding their generosity in light of Jack's illness, to avoid the possibility that the complex could slip back into the problem of high vacancy rates. Given the scanty evidence of accommodation in this record, a rational trier of fact could easily conclude that the limited partnership failed to take positive steps to reasonably accommodate Jack's condition, and chose instead to discharge the Sedlaceks, based on the reports of Greene, Tecton Corporation, and Precision Management Company. Thus, a rational trier of fact could conclude that the Sedlaceks were wrongfully discharged based on disability discrimination. We conclude that Diane has established specific and material facts sufficient to support a conclusion that public-policy-linked conduct caused the dismissal of the Sedlaceks from their employment.

### D. The Absence of Justification Element

██ ██ The final element is whether the limited partnership had an overriding justification for discharging the Sedlaceks. This element acknowledges that some public policies, even if clearly mandated, are not strong enough to warrant interfering with employers' personnel management. *Gardner*, 128 Wn.2d at 947. Skyline Park Limited Partnership maintains that the Sedlaceks were discharged because of the poor quality of their work. But Greene, who was hired by the limited partnership, stated that the problems at Skyline Park Apartments were caused by

Jack's leukemia. Assuming without deciding that Jack was disabled (i.e., "handicapped") as defined by law, a rational trier of fact could conclude that the limited partnership's proffered reason for the discharge was pretextual, i.e., that the Sedlaceks were discharged so that the limited partnership could avoid the necessity of reasonable accommodation or because the Hillises were afraid that leukemia was transmittable. Consequently, Skyline Park Limited Partnership is not entitled to a judgment as a matter of law on the Sedlaceks' wrongful discharge in violation of public policy claims.

In sum, we affirm the trial court's dismissal of the Sedlaceks' statutory disability discrimination claims, and reverse the trial court's dismissal of their wrongful discharge in violation of public policy claims.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will be filed for public record in accord with RCW 2.06.040, it so ordered.

COLEMAN and ELLINGTON, JJ., concur.

Reconsideration denied August 15, 2000.

Review granted at 142 Wn.2d 1024 (2001).