36 P.3d 1014 (2001)
Diane SEDLACEK, individually and as the Administratrix of the Estate of Andrew J. Sedlacek, deceased, Respondent,
v.
Larry O. HILLIS and Veralene Hillis, husband and wife, and the marital community composed thereof, d/b/a Skyline Park Limited Partnership, Petitioners.
No. 70254-3.
Supreme Court of Washington, En Banc.
Argued May 15, 2001.
Decided December 20, 2001.
*1015 Jeffrey Lowell Needle, Deanna Jill Hawkins Barnes, Seattle, Amicus Curiae on Behalf of Washington Employment Lawyers Association.
Reed, McClure, William Robert Hickman, Seattle, for Petitioner.
Van Siclen, Stocks & Firkins, John Stocks, Robert Craig Van Siclen, Auburn, Terry Ann Zundel, Seattle, for Respondent.
BRIDGE, J.
The respondent, Diane Sedlacek, a nondisabled person, claims that she was wrongfully discharged from her position as a member of a husband-wife apartment management team because of her association with her disabled husband. The federal Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213 (1994), prohibits employers with 15 or more employees from discriminating against able-bodied persons who are associated with or related to disabled persons. Washington law does not. We are asked to decide whether federal law provides a clear mandate of public policy on which a nondisabled employee, who is employed with a disabled employee, can base a state tort claim of wrongful discharge. We hold that it does not.

FACTS
Jack and Diane Sedlacek were employed as apartment managers for the Skyline Park Apartments from August 1988 until they were terminated in March 1996. The 192-unit *1016 apartment complex is owned by petitioners, Larry O. and Veralene Hillis, as general partners of Skyline Park Limited Partnership. The Sedlaceks were hired as a team and they served in that capacity until their termination. Although there was no written employment contract, the Sedlaceks were responsible for maintaining the apartment buildings and grounds, and for promptly renting vacant apartments so that the complex would be profitable for the owners.
Jack was diagnosed with acute myelogenous leukemia in December 1995. Diane notified the Hillises of Jack's illness before the end of that year. Jack remained hospitalized until January 31, 1996 when he was able to resume his maintenance duties with some new limitations resulting from his cancer.
Diane states that before the termination, the Hillises never mentioned any problem with the Sedlaceks' job performance. However, Diane concedes that after Jack's hospitalization, the Hillises began to complain about the number of days that Jack had missed from work and, for the first time, about the vacancy rate. To the contrary, the Hillises contend that over the last two years of the Sedlaceks' employment, they complained to the Sedlaceks on numerous occasions that the vacancy rate was unacceptably high and that the Sedlaceks responded that the downturn was probably cyclical. The Hillises accepted this explanation until the vacancy rate reached an all time high in February 1996.
In response to the high vacancy rate, Larry Hillis arranged to have property management consultant, Kimberly Greene, visit Skyline Park. Greene reported that, in her opinion, the outside areas of the apartment complex were not being adequately maintained and were in such a condition that potential tenants were likely to be discouraged from viewing apartments in the complex. Greene worked at the Skyline complex alongside the Sedlaceks for one month in order to improve the management and vacancy rates. Greene reports that the Sedlaceks resisted her new policies and she had many conversations with the Hillises surrounding the Sedlaceks' unwillingness to cooperate.
Around March 1996, the vacancy rate began to improve significantly and the Hillises eventually asked Greene to manage the complex permanently. She accepted on the condition that she could dismiss the Sedlaceks. The Hillises agreed and Greene informed the Sedlaceks of their termination on March 14, 1996. Greene states that she was aware of Jack's illness but would have insisted on the termination even if he were not ill.
Diane asserts that she and her family did the best they could to maintain the complex under the circumstances and they got little help from the Hillises. In addition, there were instances where the Sedlaceks asked for help in dealing with disposal of larger items, but the Hillises neglected to take any action. Diane claims that the Hillises fired them to avoid accommodating Jack's disability.
The Sedlaceks initiated this action alleging, among other things, that Jack had been wrongfully discharged in violation of a public policy against disability discrimination. After Jack's death in August 1996, Diane was named administratrix of her husband's estate and replaced her deceased husband as a party in this action. Diane then filed an amended complaint adding, among others, a claim that she was wrongfully discharged because of her association with and status of being married to a disabled person.
On February 27, 1998, the trial court granted the Hillises' motion for summary judgment, dismissing all claims except those for wrongful discharge in violation of public policy. The court reserved its ruling on these claims pending completion of discovery. After a subsequent motion for summary judgment, the trial court dismissed the remaining claims and the complaint in full.
Diane appealed. The Court of Appeals affirmed the dismissal of all claims except those asserting wrongful discharge in violation of public policy.[1] The court determined that the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, constituted *1017 a clear mandate of public policy against disability discrimination.[2] Furthermore, disputed facts existed as to whether the Hillises' actions jeopardized this public policy and whether Jack's disability caused the Sedlaceks' discharge.[3] The Court of Appeals also reasoned that because Jack and Diane were hired as a team, "[i]t can be no less a violation of public policy to wrongfully discharge a team based on the disability of one member of the team than it would be to wrongfully discharge a single employee based on his or her disability."[4]
The Hillises filed a petition for review of the Court of Appeals decision with regard to Diane's claim as an able-bodied associate and relative of Jack. This court granted the Hillises' petition for review of Diane's claim of wrongful discharge in violation of public policy. Because the petition for review and subsequent petitioners' briefs object only to the Court of Appeals holding that Diane's claim of wrongful discharge must survive summary judgment, no other claims are before this court.

ANALYSIS

I
An employment relationship that is not governed by a definite contract is generally terminable at will. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 223, 685 P.2d 1081 (1984). However, we have recognized that the tort of wrongful discharge in violation of public policy is a narrow exception to the employment at-will doctrine in Washington State. Id. at 232, 685 P.2d 1081.
In 1984, this court first adopted the tort of wrongful discharge in violation of clearly mandated public policy. Id. at 232, 685 P.2d 1081. In Thompson, the plaintiff sued for wrongful discharge arguing, in part, that he was fired because he implemented accurate accounting practices in compliance with the Foreign Corrupt Practices Act of 1977 (FCPA), 91 Stat. 1494, a federal statute intended to prohibit bribery of foreign officials. Id. at 223, 234, 685 P.2d 1081. Thompson asserted that the company dismissed him because he insisted on compliance with the federal requirements and the company intended for his dismissal to serve as a warning to all employees in his position. Id. at 234, 685 P.2d 1081.
The Thompson court joined a growing number of states by adopting the tort of wrongful discharge in violation of clear public policy. Id. at 232, 685 P.2d 1081. We reasoned that findings of public policy must be clearly grounded in legislation or prior jurisprudence in order to protect employers from frivolous lawsuits and to assure balance between the interests of the employer and the interests of the employee. Id. at 232-33, 685 P.2d 1081. We stated:
"In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject."
Id. at 232, 685 P.2d 1081 (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625, 631 (1982)).
In Thompson's case, this court held that the FCPA was a clear expression of public policy in favor of careful accounting to prevent bribery of foreign officials. Id. at 234, 685 P.2d 1081. Consequently, if Thompson could prove that his dismissal was a result of his compliance with the federal law or that the discharge was intended to encourage other employees to violate that law, then his dismissal was contrary to the clear mandate of public policy. Id.
In 1996, this court further developed the tort of wrongful discharge in Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 913 P.2d 377 (1996). Plaintiff, Kevin M. Gardner, was discharged from Loomis because he violated a strict company policy by abandoning *1018 his armored car to help a person whose life was being threatened by an armed bank robber. Id. at 933-35, 913 P.2d 377. Before reaching the facts of the case, the Gardner court recognized that public policy tort actions were generally permitted in four situations:
(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.
Id. at 936, 913 P.2d 377 (citing Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002 (1989)). The court then noted that most wrongful discharge cases to reach this court to date had fallen under the third and fourth categories. Id. at 937, 913 P.2d 377. Of those cases, most judgments for plaintiffs had presented one-sided situations where no legitimate employer interest was offered. Id. at 938, 913 P.2d 377. However, the Gardner case involved legitimate and valid reasons from both the plaintiff and the defendant in defense of their actions. Id.
Because the Gardner case necessitated a more refined analysis,[5] the court declared that a plaintiff must prove the following four elements to succeed in a claim for wrongful discharge in violation of a public policy:
(1) The plaintiffs must prove the existence of a clear [mandate of] public policy (the clarity element).
(2) The plaintiffs must prove that discouraging the conduct in which [the employee] engaged would jeopardize the public policy (the jeopardy element).
(3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element).
(4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element).
Id. at 941, 913 P.2d 377. Under this test, the Gardner court found that Washington statutes and case law expressed a clear public policy in support of preservation of human life. Id. at 945, 913 P.2d 377. The court was careful to draw the public policy as a narrow one and rejected broader proposals, including a general policy to encourage helping others. Id. at 949, 913 P.2d 377. Because Gardner could meet the second and third elements of the test and the defendant could present no overriding justification for the discharge, this court held that Gardner's discharge violated a clear public policy of the state of Washington. Id. at 950, 913 P.2d 377.
Finally, this court recently extended the wrongful discharge doctrine in Roberts v. Dudley, 140 Wash.2d 58, 993 P.2d 901 (2000). Roberts alleged that Dudley discharged her because she was pregnant and that this discharge was wrongful in violation of Washington's public policy against sex discrimination. Id. at 61, 993 P.2d 901. The Roberts court held that the WLAD created a clear mandate of public policy against sex discrimination that governs all Washington employers, even though the WLAD's statutory remedies can only apply to employers with eight or more employees. Id. at 72-73, 993 P.2d 901; RCW 49.60.040(3). Although Dudley never employed eight or more employees, the public policy expressed in the WLAD provided a basis for the plaintiff's wrongful discharge claim. Id. at 72-73, 993 P.2d 901. Therefore, in Roberts, this court allowed a wrongful discharge claim outside of the categories listed in Gardner, and it expressed a willingness to hold that a broad public policy articulated in a statute could extend beyond the reach of the statutory remedies created by the Legislature so long as the policy is clear. Id. at 69-70, 64-65, 993 P.2d 901 (retaining the four-element Gardner test).
Whether or not a clear mandate of public policy exists, sufficient to meet the first element of the Gardner test, is a question of law. Dicomes, 113 Wash.2d at 617, 782 P.2d 1002. This court has found Washington statutes and case law to be primary sources of Washington public policy. See, e.g., Roberts, 140 Wash.2d at 66-67, 993 P.2d *1019 901; Smith v. Bates Technical College, 139 Wash.2d 793, 807, 991 P.2d 1135 (2000); Gardner, 128 Wash.2d at 945, 913 P.2d 377; Bravo v. Dolsen Cos., 125 Wash.2d 745, 758, 888 P.2d 147 (1995); Bennett v. Hardy, 113 Wash.2d 912, 925, 784 P.2d 1258 (1990). In addition we have occasionally found other sources of public policy to be adequate. For example this court recognized that a municipal fire code was sufficient to establish a public policy against disabling a fire system without proper authorization. Ellis v. City of Seattle, 142 Wash.2d 450, 466-67, 13 P.3d 1065 (2000). Similarly, the Thompson court found that adequate public policy existed in the federal FCPA to support a state tort claim of wrongful discharge. Thompson, 102 Wash.2d at 234, 685 P.2d 1081.

II
This case requires us initially to determine whether Diane's claim of associational discrimination violates a clear mandate of public policy in Washington State, thereby satisfying the first prong of the Gardner test. Based on the Roberts reasoning, the Court of Appeals held that Jack's claim rested on a clear public policy against disability discrimination established in the WLAD. Sedlacek v. Hillis, 104 Wash.App. 1, 18, 3 P.3d 767 (2000). The court then reasoned that because Jack and Diane were hired as a team, she deserves no less protection than Jack from wrongful termination based on his disability. Id. at 20, 3 P.3d 767.
The Hillises appealed the reinstatement of Diane's claim for wrongful discharge in violation of public policy. In response, Diane has cited the ADA, which prohibits employers with 15 or more employees from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees." 42 U.S.C. § 12112(a). Under the ADA, the term "discriminate" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Although the ADA's statutory remedies cannot apply in this case because the Hillises employed fewer than 15 employees,[6] Diane claims that the definition of "discriminate" under the ADA provides a clearly mandated public policy prohibiting discrimination against her because of her association with Jack.
Despite this court's acceptance of a federal statute as a source of public policy in Thompson, we cannot conclude that a clear mandate of public policy exists merely because the plaintiff can point to a potential source of public policy that addresses the relevant issue. In order to ensure that we can balance the interests of employer and employee, and to ensure judicial restraint, we have imposed additional limitations on the establishment of public policy. Thompson, 102 Wash.2d at 232, 685 P.2d 1081. For example, the asserted policy must be truly public. See Dicomes, 113 Wash.2d at 617-18, 782 P.2d 1002 (recognizing need to distinguish between employee conduct motivated by purely private interests and conduct motivated by concern for welfare of general public). Furthermore, the asserted public policy must be clear.
We also recognize that the wrongful discharge exception should be applied cautiously in order to avoid allowing an exception to swallow the general rule that employment is terminable at will. Further, the Legislature is the fundamental source for the definition of this state's public policy and we must avoid stepping into the role of the Legislature by actively creating the public policy of Washington. "This court should resist the temptation to rewrite an unambiguous statute to suit our notions of what is good public policy, recognizing the principle that `the drafting of a statute is a legislative, not a judicial, function.'" State v. Jackson, 137 Wash.2d 712, 725, 976 P.2d 1229 (1999) (quoting State v. Enloe, 47 Wash.App. 165, 170, 734 P.2d 520 (1987)). An argument for the adoption of a previously unrecognized public policy under Washington law is better addressed to the Legislature. Id. at 725, 976 P.2d 1229; see also Roberts, 140 Wash.2d at 79, 993 P.2d 901 (Talmadge, J., concurring) ("The specter of judicial activism is unloosed *1020 and roams free when a court declares, `This is what the Legislature meant to do or should have done.'"). Therefore, we should not create public policy but instead only recognize clearly existing public policy under Washington law.
Diane claims that the ADA provides a clear mandate of Washington public policy. However, the Legislature has not extended its prohibition on disability discrimination to include discrimination against able-bodied persons associated with or related to a disabled person. Furthermore, both the Washington Administrative Code and a recent holding of this court limit the definition of disability discrimination to include only discrimination against persons with disabilities. See WAC 162-22-020(2)(c); Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 641, 9 P.3d 787 (2000).
The Legislature, through the WLAD, sought to eliminate and prevent "discrimination in employment ... because of ... the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a disabled person." RCW 49.60.010. However, the statute itself creates no protection for those associated with or related to a disabled person. Although the current ADA protection for associates and relatives of disabled persons was enacted in 1990, in the decade since, the Legislature has not chosen to adopt this definition of discrimination as its own.
The Legislature delegated promulgation of regulations under the WLAD to the Washington Human Rights Commission. RCW 49.60.120(3). In WAC 162-22-020(2)(c), the commission defined the terms of chapter 49.60 RCW:
A condition is a `sensory, mental, or physical disability' if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question.... In other words, for enforcement purposes a person will be considered to be disabled by a sensory, mental, or physical condition if he or she is discriminated against because of the condition and the condition is abnormal.
(Emphasis added.) Thus, the Human Rights Commission has not extended its protection to associates or relatives of disabled persons.
Finally, in Pulcino this court noted dissatisfaction with the commission's definition of disability when it was necessary to apply the definition in the context of an employee's claim based on the accommodation theory. Pulcino, 141 Wash.2d at 641, 9 P.3d 787. This court created its own definition with respect to accommodation claims. The definition limits such claims to disabled plaintiffs:
we find that an accommodation claimant satisfies the `handicap' element of his or her claim by proving that (1) he or she has/had a sensory, mental, or physical abnormality and (2) such abnormality has/ had a substantially limiting effect upon the individual's ability to perform his or her job.
Id. This court too has limited protection from disability discrimination to those persons with disabilities.
In sum, the Legislature has not extended the WLAD to include a prohibition against association discrimination, the Human Rights Commission's definition of disability discrimination is limited to disabled persons themselves, and this court's recent definition of "handicap" with regard to an accommodation claim reflects the same limitation. Therefore, neither the legislative, executive, nor judicial branch of government in Washington has adopted a public policy against discrimination based on an able-bodied person's association with or relation to a disabled person, despite the decade since Congress chose to do so. Because Washington has created a state antidiscrimination law that is comparable to the ADA and the Legislature has not expanded its WLAD to protect those associated with or related to disabled persons, this court cannot adopt the ADA's policy as a clear mandate of public policy in this state.
Nevertheless, the Sedlaceks argue that a federal statute served as an acceptable source of public policy in Thompson. In that case, we held that firing an employee because of his insistence that his company comply with the FCPA violated a clear mandate of public policy. Thompson, 102 Wash.2d at 234, 685 P.2d 1081. The FCPA and its related *1021 accounting requirements regulated the interaction between American corporations and foreign officials. See id. The Legislature had not created comparable laws governing these types of relationships. Therefore, there existed no statement of Washington law or policy on the subject, making the FCPA the only applicable expression of policy in the jurisdiction.
In Thompson, the St. Regis Paper Company did not dispute that it was subject to this federal law. Generally speaking, the state has a strong interest in ensuring that its citizens comply with the law, whether the source of the law is federal or state. Thus, when an employer terminates an employee for refusing to violate a law that is enforceable in the jurisdiction in which the employer is located, the employer's actions run contrary to both the law's public policy and the state's interest. However, where there is no violation or potential violation of an enforceable law, as is the case here, a plaintiff cannot rely on the state's interest in ensuring that its citizens comply with the law.[7] Neither the Legislature nor Washington case law has adopted a policy to protect citizens in Diane's situation from discrimination. Adoption of previously unrecognized public policy under Washington law is better left to the Legislature. Therefore, we hold that no clear mandate of public policy exists in Washington to protect those who are related to or associated with a person with a disability. The first prong of the Gardner test not being satisfied, we need not discuss the extent to which the other three elements may apply to Diane's claim.

CONCLUSION
Washington law governing the doctrine of wrongful discharge in violation of a clear mandate of public policy requires a plaintiff to show, as a matter of law, that a clear mandate of public policy exists. Although clear mandates of public policy can arise out of a wide variety of sources, the inquiry does not end with the determination that a policy is expressed in an approved source. The source must also state a clear mandate of Washington public policy. We hold that the ADA does not provide a clear mandate of Washington public policy in favor of protecting from discrimination able-bodied persons who are related to or associated with a disabled person. The Court of Appeals decision reinstating Diane's claim is reversed. There being no other claims of error before this court, the remainder of the opinion of the Court of Appeals is affirmed. The case is remanded for proceedings not inconsistent with this opinion.
ALEXANDER, C.J., SMITH, MADSEN, and OWENS, JJ., concur.
SANDERS, J. (dissenting).
The majority fails to explain why we can no longer rely on federal law as a source of public policy to underlie the tort of wrongful discharge. In fact, this tort was first recognized based on policy as expressed in a federal statute and has developed in harmony with federal employment discrimination law.
There is a clear and strong connection between federal law and our state law on discrimination, conspicuously absent from the majority opinion. See, e.g., RCW 49.60.030(2) (referring to the United States Civil Rights Act of 1964 and the Federal Fair Housing Amendments Act of 1988); Farnam v. CRISTA Ministries, 116 Wash.2d 659, 676, 807 P.2d 830 (1991). We consistently rely on federal law as guidance in interpreting Washington's Law Against Discrimination. *1022 See, e.g., Farnam, 116 Wash.2d at 676, 807 P.2d 830 ("[B]ecause RCW 49.60 substantially parallels the federal law against discrimination, Title 7 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., Washington courts have looked to the interpretation of the federal law in construing RCW 49.60." (footnote omitted)); Bravo v. Dolsen Cos., 125 Wash.2d 745, 754-55, 888 P.2d 147 (1995); Roberts v. Atl. Richfield Co., 88 Wash.2d 887, 891, 568 P.2d 764 (1977).
Although it is true most of our past cases involving wrongful discharge have used Washington law as the source of public policy, the use of federal law for the same purpose is far from unprecedented. Our decision to recognize the tort of wrongful discharge in Thompson v. St. Regis Paper Co. was based on public policy as expressed in a federal statute. 102 Wash.2d 219, 685 P.2d 1081 (1984). In Thompson we spoke in general terms of constitutional, statutory, regulatory, and judicial sources of public policy.
"In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy."
Id. at 232, 685 P.2d 1081 (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625, 631 (1982)). We then decided the dispute before us by relying on the Foreign Corrupt Practices Act of 1977 as a clear expression of public policy to hold the employer liable for wrongfully discharging an employee for insisting on complying with the federal act. Thompson, 102 Wash.2d at 234, 685 P.2d 1081 ("If [Thompson's] discharge was premised upon his compliance with the accounting requirements of the Foreign Corrupt Practices Act ... then his discharge was contrary to a clear mandate of public policy and, thus, tortious.").
Since Thompson our reliance on federal law in employment discrimination has continued. For example, the very test by which we determine whether a plaintiff has set forth a prima facie case of employment discrimination is based on federal law. That test was developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). See Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 361-63, 753 P.2d 517 (1988) (adopting the McDonnell test in an age discrimination claim under RCW 49.60.180); Baldwin v. Sisters of Providence in Wash., Inc., 112 Wash.2d 127, 136, 769 P.2d 298 (1989) (extending Grimwood to common law termination claims). See also Douchette v. Bethel Sch. Dist. No. 403, 117 Wash.2d 805, 816, 818 P.2d 1362 (1991) (approving of the Court of Appeals' reliance on federal case law to determine when a wrongful discharge claim accrues).
Other than to restate the obviousthat existing Washington statutes, regulations, or case law do not expressly prohibit association discriminationthe majority has not explained why we cannot do as we did in Thompson, and have been doing ever since, which is to rely on federal law to evince a clear mandate of public policy.
Not only is the majority's decision to reject our past reliance on federal law without explanation, it also places us in a distinct minority among our sister states. To date, of those states that have addressed whether a wrongful discharge claim can be based on public policy as evinced in federal law, the vast majority have answered in the affirmative. See, e.g., Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 436 A.2d 1140, 1144 (1981) (holding the federal Occupational Safety and Health Act may serve as a source of public policy); Kulch v. Structural Fibers, Inc., 78 Ohio St.3d 134, 677 N.E.2d 308, 321 (1997) (same); Wheeler v. Caterpillar Tractor Co., 108 Ill.2d 502, 92 Ill.Dec. 561, 485 N.E.2d 372, 377 (1985) (holding public policy may be found in federal nuclear safety statutes); Norris v. Hawaiian Airlines, Inc., 74 Haw. 235, 842 P.2d 634, 646 (1992) (holding Federal Aviation Act and the federal aviation regulations may be source of public policy), aff'd, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994); Green v. Ralee Eng'g Co., 19 Cal.4th 66, 960 P.2d 1046, 1050, 78 Cal.Rptr.2d 16 (1998) (same); Peterson v. Browning, 832 P.2d 1280, 1283 (Utah 1992) *1023 (holding federal law may serve as the basis of public policy as long as connection is shown between law violated and the public policies of the State of Utah); Faulkner v. United Technologies Corp., 240 Conn. 576, 693 A.2d 293, 297-98 (1997) (holding federal law can serve as source of public policy); see generally Henry H. Perritt, Employee Dismissal Law and Practice § 7.13 (4th ed. 1998 & Supp.2001).
Unless we are willing to overrule prior precedent we are bound to adhere to the rule articulated in Thompson and continue to rely on federal law as a source of public policy. Here that law is the Americans with Disabilities Act of 1990(ADA) (42 U.S.C. §§ 12101-12213). Although the majority opinion refers to this federal act, it fails to acknowledge it provides an existing and clear mandate of public policy:
[T]he term "discriminate" includes
....
(4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association[.]
42 U.S.C. § 12112(b)(4);[1]see also 29 C.F.R. § 1630.8; cf. Roe v. Quality Transp. Servs., 67 Wash.App. 604, 610, 838 P.2d 128 (1992) (noting courts must find, not create, public policy).
The public policy mandate of the ADA fits squarely into the purpose of the tort of wrongful dischargeto prevent employers from using the employment at will doctrine as a shield from repercussions for taking socially undesirable actions. See Thompson, 102 Wash.2d at 231, 685 P.2d 1081. To deny Mrs. Sedlacek her day in court is to allow discrimination against individuals with disabilities and those with whom such persons have a relationship or association. See Amicus Curiae Br. of Wash. Employment Lawyers Ass'n at 9.
Other courts have recognized federal law "enunciate[s] a clearly mandated public policy to be uniformly enforced throughout the United States." Wheeler, 92 Ill.Dec. 561, 485 N.E.2d at 374. For example, in Kulch v. Structural Fibers, Inc., the Ohio Supreme Court held the federal Occupational Safety and Health Act (OSHA) constituted "a sufficiently clear expression of public policy to warrant an exception to the doctrine of employment at will." 677 N.E.2d at 322. The Court noted the State of Ohio had a broad public policy demanding employees be provided with safe work environments. Id. Since the federal OSHA was consistent with that policy, the court found no reason not to use that federal statute as a source of Ohio public policy concerning workplace safety. Id.
Similarly, Washington has a broad public policy against employment discrimination. The ADA provision at issue here is consistent with that policy. It enunciates a national public policy against association discrimination. I see no reason why we should discontinue our use of federal law as a source of specific public policy, especially when such is consistent with broader Washington public policy.
The majority places much emphasis on the fact Mrs. Sedlacek does not have access to the statutory remedies offered by the ADA because her employers do not fall into the category of employers subject to that act. See 42 U.S.C. § 12111(5)(A). However, that does not justify barring her from relying on the ADA in her wrongful discharge claim. As we recognized in Roberts v. Dudley, the mere fact an employer does not meet a statutory definition is no reason to bar an employee *1024 seeking to recover under the common law. 140 Wash.2d 58, 75-76, 993 P.2d 901 (2000). The majority's decision to deny the common law claim of wrongful discharge because of the statutory definition of "employer" is inconsistent with our opinion in Roberts v. Dudley.
This is an appeal from a summary judgment dismissing all claims brought by Mrs. Sedlacek on her own behalf and on behalf of her late husband. Viewing the facts in the light most favorable to Mrs. Sedlacek in her capacity as the nonmoving party, she has raised a fair inference that her husband's cancer was the reason why the Hillises fired her. If that is the case, the Hillises have violated the public policy expressed in the ADA. The burden therefore shifts to the Hillises to show the discharge was for reasons other than Mr. Sedlacek's cancer. See Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 67-68, 821 P.2d 18 (1991). This presents a genuine issue of material fact rendering summary judgment dismissal inappropriate. See CR 56(c).
Lastly, I note neither preemption nor federalism defeats reliance on federal law as a source of public policy. By relying on the ADA as a source of public policy, we are not enforcing that statute per se. Rather, we merely give force to the public policy expressed therein. We are regularly presented with questions of federal law and policy, and as state courts we are capable of determining questions of this kind. Engrafting federal policy within a state common law concept would not offend our limited sovereignty. Cf. Adler v. Am. Standard Corp., 538 F.Supp. 572, 579 (D.Md.1982).
I dissent.
JOHNSON, J., concurs.
CHAMBERS, J. (concurring in dissent).
I concur with Justice Sanders' dissent, but write separately concerning the Washington law regarding associational discrimination. I can think of no more insidious face of discrimination than firing an employee because of the race, or the age, or the religion of the employee's spouse. I write separately to emphasize I do not read the majority to permit, under the guise of at will employment, the discharge of a woman because of the race of her husband. I do not read the majority to permit the discharge of a man because his employer finds his wife's national origin offensive. And I do not believe the majority condones or would permit employer retaliation against an employee for the acts or conduct of the employee's spouse. See generally Magula v. Benton Franklin Title Ins. Co., 79 Wash.App. 1, 901 P.2d 313 (1995).
The Legislature has declared the purpose of our Law Against Discrimination:
The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, families with children, sex, marital status, age, or the presence of any sensory, mental, or physical disability ... are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundations of a free democratic state.
RCW 49.60.010. If Diane Sedlacek was discharged because of her husband's disability, she has a viable cause of action. Her husband's disability fell within a category protected by the Law Against Discrimination. The public policy of this State was violated by this associational discrimination, and the law of this State gives her a remedy. While there may be reasonable limits to associational liability, an employer may not fire an employee because of her co-employee husband's disability.
Therefore, I would affirm the Court of Appeals and respectfully concur in dissent.
IRELAND, J., concurs.
NOTES
[1] Sedlacek v. Hillis, 104 Wash.App. 1, 25, 3 P.3d 767 (2000).
[2] Id. at 19, 3 P.3d 767.
[3] Id. at 21, 24-25, 3 P.3d 767.
[4] Id. at 20, 3 P.3d 767.
[5] Id. at 940, 913 P.2d 377.
[6] See 42 U.S.C. § 12111(5)(A); Sedlacek, 104 Wash.App. at 16, 3 P.3d 767.
[7] One could argue that no actual or potential violation of law should be required to establish a clear mandate of public policy because none occurred in Roberts. In that case, as here, the employer was too small for the applicable statutory remedies to apply. Roberts, 140 Wash.2d at 60, 993 P.2d 901. Even so, this court was willing to extend remedies to the plaintiff under the tort of wrongful discharge in violation of the more general public policy expressed in the statute. Id. at 70, 993 P.2d 901. Yet the key distinction between Roberts and this case is that the Roberts court relied on a clear mandate of Washington public policy. The Roberts court found that the public policy against sex discrimination was firmly established in Washington statute, 140 Wash.2d at 66-73, 993 P.2d 901 (citing RCW 49.12.200 and chapter 49.60 RCW) and in Washington case law, id. at 66, 993 P.2d 901 (citing Marquis v. City of Spokane, 130 Wash.2d 97, 922 P.2d 43 (1996)).
[1] Association discrimination has been declared contrary to public policy in other areas of discrimination:

(1) It is an unfair practice for any person, whether acting for himself, herself, or another, because of sex, marital status, race, creed, color, national origin, families with children status, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a disabled person:
....
(f) To discriminate in the sale or rental, or to otherwise make unavailable or deny a dwelling, to any person; or to a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or to any person associated with the person buying or renting[.] RCW 49.60.222(1)(f) (emphasis added).