**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| DANIEL BRAY, individually, and JOEY TRACY, individually, | No.  53080-5-II |
| Respondents, | |
| v. | |
| PIERCE COUNTY, a subdivision of the State of Washington, | UNPUBLISHED OPINION |
| Petitioner. | |

WORSWICK, J. —  Daniel Bray and Joey Tracy, two former Pierce County Sheriff's Department deputies, sued Pierce County for wrongful termination, alleging that they were discharged in violation of public policy for whistleblowing activity.  Bray and Tracy allege they were constructively terminated after they reported that other deputies had returned a firearm to the restrained party to a domestic violence protection order, who later murdered the protected party with the firearm.  The County moved to dismiss Bray's and Tracy's claims, arguing that they had failed to identify the public policy to support their claim.  The trial court denied the County's motion.

The trial court then certified its order for discretionary review, and a commissioner of this court granted discretionary review, ruling that "whether a clear mandate of public policy exists under these circumstances is a controlling question of law on which there is [a] substantial

ground for a difference of opinion."[1] We hold that under these circumstances, Bray and Tracy have identified a clear public policy to protect victims of domestic violence and to not affirmatively arm a restrained party when serving a domestic violence protection order. We affirm the trial court's order denying partial summary judgment.

FACTS

In April 2015, Regina Annas obtained an ex parte domestic violence temporary protection order[2] (TPO) against her husband David Annas, based on allegations of domestic violence and threats of domestic violence. The judicial officer found that an emergency existed, and granted the order without notice to David to prevent "irreparable harm." Clerk's Papers (CP) at 38.

The TPO gave Regina exclusive rights to their shared residence and required David to vacate immediately, but it allowed David to take his personal clothing and "tools of trade" while a law enforcement officer was present.[3] CP at 39. The TPO information sheet prepared by Regina, and given to the deputies, showed that this was a domestic violence case and that there were firearms inside the residence. When the deputies approached the residence to serve the TPO, they found David in the driveway of the home. David appeared very upset when the

---

[1] Ruling Granting Review, *Bray v. Pierce Cnty.*, No. 53080-5-II, at 9 (Wash. Ct. App. April 8, 2019).

[2] Former RCW 26.50.070(1) (2018) provides for the issuance of an "ex parte temporary order of protection, pending a full hearing" upon a showing of "irreparable injury." "Irreparable injury . . . includes but is not limited to situations in which the respondent has recently threatened petitioner with bodily injury or has engaged in acts of domestic violence against the petitioner." Former RCW 26.50.070(2).

[3] Because Regina Annas and David Annas share the same last name, we refer to them by their first names for clarity, intending no disrespect.

officers explained that they were serving a TPO removing him from the residence. Deputies informed David that he had a few minutes to gather his belongings, but that he had to vacate the residence.

The deputies asked if David had any guns in the house, and David stated that he had a loaded pistol in his bedroom in a dresser drawer. Deputies reported that David told them he wanted to take the gun with him because his wife was a drug user, other drug users were frequent invitees to the house, and that he was afraid they would steal his belongings. David also told deputies that he did not want them to take the gun for safekeeping. David showed Deputy Ara Steben where the gun was located inside the home, and Steben retrieved the pistol, unloaded it, and gave the gun and loaded magazine to Sergeant Alvin Mierke and Deputy Zakary Spencer, telling them to hold the weapon until David had completed exiting the residence.

After David had finished gathering his belongs and loaded his car to leave, Mierke handed the gun and loaded magazine to Steben who then placed them in David's car on the floor behind the driver's seat.[4] Deputies reported that David appeared relatively calm when he left. The deputies then informed Regina that the TPO had been served and they left the scene.

About three hours later, Bray and Tracy responded to a 911 call regarding a shooting at the Annases' residence. The deputies arrived at the scene to find that David had used the gun given to him earlier by Steben to shoot and kill Regina, wound Regina's friend, and kill himself.

Following the incident, Bray and Tracy reported to their supervisors that the murder weapon had been returned to David by a Pierce County Sheriff's Department deputy. Bray and Tracy told their supervisors that giving a firearm to a subject involved in a domestic violence

_____

[4] There is no evidence that David required a firearm as a "tool of the trade."

dispute while serving a TPO was improper, was contrary to the training they had received as officers, was against the policies and procedures of the County, and was unlawful.

Bray and Tracy made repeated reports regarding this incident because they believed the deputies violated the sheriff's department policy, and they sought to prevent future similar incidents. These reports continued "[o]ver the next months," because Bray and Tracy were unsatisfied with the County's response and failure to conduct an investigation. CP at 228.

According to Bray and Tracy, the County attempted to silence them with a malicious campaign of retaliation and hostility. They ultimately separated from employment with the Pierce County Sheriff's Department.[5]

In March 2018, Bray and Tracy filed a lawsuit against the County.[6] The cause of action at issue here, wrongful termination in violation of public policy, is based on an allegation that Bray and Tracy were retaliated against for whistleblowing activities.

The County filed a motion for partial summary judgment seeking dismissal of the wrongful termination claim, which was denied by the trial court. The trial court certified the order for review under RAP 2.3(b)(4).

A commissioner of this court ruled that the trial court appropriately certified this order for review because, "whether a public policy exists under these circumstances is a controlling

---

[5] Bray and Tracy allege in their complaint that they were constructively terminated through a systematic retaliation campaign perpetrated by the County for reporting what they allege was employer misconduct, and that "it is a clear public policy that police officers follow the law by protecting victims of domestic violence and not needlessly endangering victims." CP at 8.

[6] Bray and Tracy filed an amended complaint in July 2018 that alleges multiple other causes of action not included on review, including negligence, outrage, and the negligent infliction of emotional distress, abuse of process and malicious prosecution.

No. 53080-5-II

question of law on which there are substantial grounds for difference of opinion and review will advance the termination of the litigation." Ruling Granting Review, *Bray v. Pierce Cnty*., No. 53080-5-II, at 4, (Wash. Ct. App. April 8, 2019). The order certifying review clarified that the question of *whether* Spencer's and Steben's conduct violated any public policy is not before us. Ruling Granting Review, at 4 n.6.

ANALYSIS

This case is before us on the narrow issue of whether a public policy exists against police officers providing a firearm to an alleged domestic violence abuser when those officers are serving a domestic violence protection order. Determining what qualifies as a clear mandate of public policy is a question of law we review de novo. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 937, 913 P.2d 377 (1996).

A. *Legal Principles*

Absent a contract to the contrary, employees are generally terminable "at will." *Danny v. Laidlaw Transit Services, Inc.*, 165 Wn.2d 200, 207, 193 P.3d 128 (2008) (plurality opinion). However, our Supreme Court adopted an exception to this general rule in *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 231, 685 P.2d 1081 (1984). That case recognized a cause of action for wrongful discharge where an employee's discharge contravenes a clear mandate of public policy. *Thompson*, 102 Wn.2d at 232. These public policy tort actions are generally allowed in four situations:

> (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, *i.e.*, whistleblowing.

5

*Gardner*, 128 Wn.2d at 936. Thus, the court recognized the public policy of protecting employees who are retaliatorily discharged for reporting employer misconduct. Bray and Tracy allege they were fired in retaliation for reporting misconduct. The question here is whether the alleged action of the County constitutes misconduct.

"Misconduct," is not restricted to clear statutory violations, but also includes violations of clear public policy. *Dicomes v. State*, 113 Wn.2d 612, 620, 782 P.2d 1002 (1989). An employer need not commit an unlawful act to contravene an established clear mandate of public policy. *See Sedlacek v. Hillis*, 145 Wn.2d 379, 393 n.7, 36 P.3d 1014 (2001). As the *Dicomes* court explained, we look beyond clear statutory violations because "such a standard is unduly restrictive and does not comport with [the] . . . public policy exception in *Thompson." Dicomes*, 113 Wn.2d at 620.[7] A court can infer the existence of a clear public policy mandate from tangentially related legislative, constitutional, and judicial opinions, even in the absence of a direct expression of such public policy. *See Gardner*, 128 Wn.2d at 945 (holding a "highest priority on protection of human life" to be a "fundamental public policy," evidenced by a plethora of otherwise unrelated statutes and judicial opinions).

We apply the wrongful discharge exception cautiously "in order to avoid allowing an exception to swallow the general rule that employment is terminable at will." *Sedlacek*, 145 Wn.2d at 390. We recognize that the legislature is the fundamental source for the definition of

---

[7] Our Supreme Court in *Thompson* reasoned that a clear mandate of public policy can arise from the purpose of the written law as much as the letter itself: "'. . . courts should inquire whether the employer's conduct contravenes the letter *or* purpose of a constitutional, statutory, or regulatory provision or scheme. . . . However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.'" *Thompson*, 102 Wn.2d at 232 (emphasis added) (emphasis omitted) (quoting *Parnar v. Americana Hotels, Inc.*, 65 Hawaii 370, 652 P.2d 625, 631 (1982)).

this state's public policy, so we are careful not to step into a legislative role. *Sedlacek*, 145 Wn.2d at 390. "A court may not sua sponte manufacture public policy but rather must rely on that public policy previously manifested in the constitution, a statute, or a prior court decision." *Roberts v. Dudley*, 140 Wn.2d 58, 65, 993 P.2d 901 (2000).

To qualify as a public policy for purposes of the wrongful discharge tort, a policy must be "truly public" and sufficiently clear. *Sedlacek*, 145 Wn.2d at 389. To determine whether a clear public policy exists, we look to statutory or regulatory provisions or schemes, as well as prior judicial decisions and constitutional provisions. *Martin v. Gonzaga University*, 191 Wn.2d 712, 725, 425 P.3d 837 (2018).

B.      *Public Policy Against Arming Restrained Party to a Domestic Violence Protection Order*

   a. *Legislative Source of Public Policy*

In 1979, the legislature enacted the "Domestic Violence Act" (DVA), chapter 10.99 RCW, which required law enforcement to respond to domestic violence. Particularly, the legislature sought to "assure the victim[s] of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide" and that the "official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim." RCW 10.99.010. Legislative findings in that year described domestic violence as "an issue of growing concern at all levels of government and there is a present and growing need to develop innovative strategies and services which will ameliorate and reduce the trauma of domestic violence." LAWS OF 1979, 1st. Ex. Sess. ch. 245, § 1.[8]

---

[8] This language is substantially the same as found in RCW 70.123.010, effective 2015.

In 1984, the legislature enacted the Domestic Violence Protection Act (DVPA), chapter 26.50 RCW, which provided victims of domestic violence with the ability to obtain civil protection orders against their abusers, RCW 26.50.030, and ex parte temporary orders of protection. Former RCW 26.50.070 (2018). Through the DVPA, the legislature amended the DVA to identify victims of domestic violence as a particular class of individuals and imposed duties on law enforcement to protect them. RCW 10.99.030; s*ee Roy v. City of Everett* 118 Wn.2d 352, 354, 823 P.2d 1084(1992) (holding that Snohomish County was not immune from suit based on alleged failure to uphold duties under the DVA); s*ee Donaldson v. City of Seattle*, 65 Wn. App 661, 668, 831 P.2d 1098 (1992) (holding that public duty doctrine does not bar liability for failure to uphold duties under the DVA).

The primary duty of police officers, when responding to a domestic violence situation, is to enforce the laws allegedly violated and to "protect the complaining party." RCW 10.99.030(5). RCW 10.99.030 requires all law enforcement officers to receive training related to handling of domestic violence complaints to stress, among other things, the "protection of the victim." RCW 10.99.030(1). In 1995, the legislature amended RCW 10.99.030 to require the criminal justice training commission to develop a training curriculum to specifically instruct law enforcement officers, to focus on the "safety of the victim" and to teach "techniques for responding to incidents that minimize the likelihood of officer injury and that promote victim safety." LAWS OF 1995, ch. 246, § 22; RCW 10.99.030(2).

In 1994, the legislature passed laws to control access to firearms in domestic violence situations, finding that "state efforts at reducing violence must include . . . reducing the unlawful use of and access to firearms" and requiring "the concerted effort of all communities and parts of

state and local governments" to do so. LAWS OF 1994, Spec. Sess., ch. 7, § 101. The legislature

criminalized the act of possessing a firearm if convicted of a domestic violence offense, RCW

9.41.040,[9] and delivering a firearm to anyone reasonably believed to be ineligible due to a

domestic violence offense. RCW 9.41.080.

Additionally, RCW 9.41.800 gave the courts broad authority to prohibit the possession of

a firearm when issuing protective orders, including temporary protective orders. The court is

compelled to order surrender of a firearm and prohibit any further possession of a firearm or

other dangerous weapon, if the court makes a finding by clear and convincing evidence that the

restrained person is sufficiently dangerous. Possession of a firearm while under an order of

protection related to domestic violence is a class C felony. Former RCW 9.41.040(2)(a)(i)

(2018).

There are also legislatively mandated warnings when purchasing a firearm. Upon

applying to purchase a firearm, the purchaser must be warned:

> CAUTION: The presence of a firearm in the home has been associated with the increased risk of death to self and others, including an increased risk of suicide, death during domestic violence incidents, and unintentional deaths to children and others.

---

[9] Former RCW 9.41.040 (1994) (LAWS OF 1994, 1st Spec. Sess., ch. 7, §402) provided:

> (1) A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm if the person owns, has in his or her possession, or has in his or her control any firearm:
>   (a) After having previously been convicted in this state or elsewhere of a serious offense, a domestic violence offense enumerated in RCW 10.99.020(2), a harassment offense enumerated in RCW9A.46.060 or of a felony in which a firearm was used or displayed, except as otherwise provided in subsection (3) or (4) of this section[.]

RCW 9.41.090(6)(b)(ii).

In 2004, the legislature affirmed its determination to reduce the incident rate of domestic violence, stating that "[i]t is appropriate to help reduce the incident rate of domestic violence by addressing the need for improved coordination and accountability among general authority Washington law enforcement agencies and general authority Washington peace officers when reports of domestic violence are made and the alleged perpetrator is a general authority Washington peace officer." LAWS OF 2004, ch. 18, § 1.

More recently, the legislature has required law enforcement to be trained to identify and address mental health issues, and "to assist agencies and law enforcement officers in balancing the many essential duties of officers with the solemn duty to preserve the life of persons with whom officers come into direct contact." RCW 43.101.452; RCW 36.28A.445(2)(c).

As it relates to domestic violence protection orders, RCW 26.50.080 requires law enforcement, upon request by the petitioner or when ordered by the court, to "accompany the petitioner and assist in placing the petitioner in possession of those items indicated in the order or to otherwise assist in the execution of the order of protection." A petitioner cannot obtain a protection order without a finding by the court that there exists "irreparable injury [that] could result from domestic violence if an order is not issued immediately," including situations where "the respondent has recently threatened petitioner with bodily injury or has engaged in acts of domestic violence against the petitioner." Former RCW 26.50.070 (2018).[10]

The long history of domestic violence legislation, coupled with specific legislation aimed at protecting victims of domestic violence from the specific harm of firearm violence, point to a

---

[10] Currently the same operative language.

clear public policy that law enforcement officers should refrain from arming a restrained party when serving a domestic violence protection order.

b. *Judicial Source of Public Policy*

Our Supreme Court in *Danny v. Laidlaw Transit Services, Inc*., recognized a clear mandate of public policy to protect victims of domestic violence. 165 Wn.2d at 200. In that case, the issue involved a claim of wrongful discharge by an employee who missed work to avail herself of the State's programs to protect victims of domestic violence. 165 Wn.2d at 206. Our Supreme Court recognized a public policy to protect victims of domestic violence by not interfering with the victim's ability to avail herself to those programs.

> The legislative, judicial, and executive branches of government have repeatedly declared that it is the public policy of this state to prevent domestic violence by encouraging domestic violence victims to escape violent situations, protect children from abuse, report domestic violence to law enforcement, and assist efforts to hold their abusers accountable.

*Danny*, 165 Wn.2d at 221.

Our Supreme Court reasoned that protecting victims of domestic violence is a community issue, stating that "'[T]he community has a vested interest in the methods used to stop and prevent future violence.'" *Danny*, 165 Wn.2d at 214-215 (alteration in original) (quoting LAWS OF 1991, ch. 301, § 1). Thus, there exists a judicial recognition of a public policy to protect victims of domestic violence.

Our review of the statutory authority, as well as prior judicial decisions clearly recognize a clear mandate of public policy to protect victims of domestic violence abuse. Under the circumstances of this case, that policy necessarily includes not affirmatively and gratuitously

11

arming the restrained party when serving a domestic violence protection order.[11] The legislature has long recognized its policy to protect victims of domestic violence and has enacted laws to protect victims from domestic violence and the particular threat of firearm violence. Laws require responding police officers to participate in particular training in these areas, and to respond in domestic violence situations, all with an aim to reduce domestic violence. Judicial decisions have also recognized a clear mandate of public policy to protect victims of domestic violence.

C.    *County's Arguments*

The County makes multiple contrary arguments. We find these arguments unavailing.

a. *County Misconduct*

The County argues that denial of the summary judgment motion was improper because the County did not commit misconduct. But this court accepted review of this case on the limited issue of "[w]hether a clear mandate of public policy exists under these circumstances is a controlling question of law on which there is [a] substantial ground for a difference of opinion." Ruling Granting Review, at 9. Whether such policy was violated is an issue beyond the scope of this review.

b. *County Failed To Follow Procedures*

The County argues that Bray and Tracy cannot maintain a claim for dismissal in violation of public policy because they failed to follow the County's whistleblowing procedures. But this

---

[11] Bray and Tracy also argue that the policies and procedures of the County support that there is an established clear mandate of public policy. But these materials are irrelevant to whether a clear public policy exists because these policies cannot proscribe a policy that is *clearly public*. We look, instead, at legislative, executive, and judicial materials. *See Danny*, 165 Wn.2d at 205.

No.  53080-5-II

issue was neither raised in the trial court, nor accepted on discretionary review, and we do not

consider it.  RAP 9.12.

        c.  *County Acted Lawfully*

        The County cites to *Bott v. Rockwell International*, 80 Wn. App. 326, 908 P.2d 909 (1996), and

argues that because the deputies who returned the firearm to David were public employees, this

cause of action must be based on misconduct that *violates the law*.  *Bott* cites to *Farnam v.

CRISTA Ministries*, 116 Wn.2d 659, 668, 807 P.2d 830 (1991) as its authority for the proposition

that "the cause of action fails if the employer acted within the law."  *Bott*, 80 Wn. App. at 336.

But "[t]he court expressly declined to limit the scope of what constitutes contravention of public

policy to clear statutory violations."  *Farnam*, 116 Wn.2d at 669 (citing *Dicomes*, 113 Wn.2d at

619).  In *Farnam*, our Supreme Court refused to extend the public policy exception to a plaintiff

who had twice told her employer she believed the alleged misconduct forming the basis of her

whistleblower complaint was actually legally protected.  116 Wn.2d at 670.  *Farnam* does not

narrow or overrule *Dicomes*, and *Bott* does not claim that it does.  *Dicomes* makes clear that the

employer misconduct in such a case is not limited to mere statutory violations,[12] and the County

has pointed to no law that exempts a governmental employee from liability for unlawful

discharge based on clear public policy.

        d.  *Deputies Merely Allowed David To Retain the Firearm*

        The County unsuccessfully tries to reframe the deputies' actions as "allowing Mr. Annas

to retain possession of his firearm, as he had a statutory and constitutional right to do so in the

absence of a court order" otherwise.  Br. of Appellant at 14.  Although we do not dispute that a

---

[12] *Dicomes*, 113 Wn.2d at 620.

13

deputy cannot disarm an individual absent legal authority, here, the deputies who served the domestic violence protective order affirmatively went into the house, located David's firearm, and placed that firearm and a loaded magazine in David's car with him. These actions are a far cry from merely allowing David to retain his firearm. The temporary order in this case gave Regina exclusive rights to the residence, and provided that David take only his clothing and "tools of trade." CP at 39. No one here suggests that the firearm fell into either category.

## CONCLUSION

We hold that the State of Washington has established a mandate of clear public policy to protect victims of domestic violence to include not gratuitously arming the restrained party to a domestic violence order of temporary protection. Thus, we affirm the order denying partial summary judgment.

_____
Worswick, J.

We concur:

_____
Melnick, J.P.T.

_____
Sutton, A.C.J.

14